MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

AARON D. WEGNER (CABN 243809)
Assistant United States Attorney

    1301 Clay St., 3rd Floor
    Oakland, California 94612
    Telephone: (510) 637-3740
    Fax: (510) 637-3724
    E-Mail: aaron.wegner@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4-14-70145 MAG |
| Plaintiff, | REDACTED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT |
| v. | |
| ANTHONY KESLINKE, | |
| Defendant. | |

## AFFIDAVIT OF IRS SPECIAL AGENT MARK D. TWITCHELL

I, Mark D. Twitchell, being duly sworn, hereby state the following:

### I. INTRODUCTION

1. This affidavit is made in support of a Criminal Complaint against for a violation of Title 18, United States Code, Section 1956(a)(3), laundering of monetary instruments. Pursuant to 18, United States Code, § 1956(a)(3), it is unlawful to engage or attempt to engage in a financial transaction with money or other property provided by a federal agent that is represented to be proceeds of a specified unlawful activity ("SUA") with the intent to either:

   a. Promote the "SUA";

   b. Conceal or disguise the nature, location, source, ownership, or control of property believed to be "SUA" proceeds; or

   c. Avoid a transaction reporting requirement under State or Federal Law.

### II. TRAINING AND EXPERIENCE

2. I am a Special Agent of the United States Department of the Treasury, IRS-CI, and have been so employed since April 2009. I am currently assigned to the Oakland Field Office, and I am trained and authorized to investigate the offenses alleged herein. During my employment with IRS-CI, I have personally conducted criminal investigations involving violations of the internal revenue laws, money laundering statutes, identity theft statutes, and related financial crimes.

3. I have participated in the execution of at least 60 federal and state search warrants involving the seizure of contraband and records relating to the concealment of assets and proceeds from fraud and/or the distribution and sales of controlled substances. Additionally, I have personally been the affiant of 15 search and seizure warrants in connection with those crimes.

4. My professional and academic training includes over six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I completed the Special Agent Basic Training Program. This training included courses in conducting criminal investigations, federal criminal statutes, financial analysis, and the law of search and seizure under the Fourth Amendment of the United States. I have also attended multiple specialized seminars with a focus on money laundering and the financial aspects relative to narcotics investigations. Prior to being a Special Agent, I was a Revenue Agent at the

IRS for two and a half years. As a Revenue Agent, I conducted examinations of tax returns to determine compliance with internal revenue laws.

5. Based on my knowledge, training and experience, I am familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities that generate large amounts of income. These methods include, among others, making cash purchases and conducting financial transactions with currency in amounts of $10,000 or less in an attempt to avoid leaving a financial paper trail. The reason being that, pursuant to 31 U.S.C. § 5313, and regulations there under including 31 C.F.R. § 1010.311 and 1010.312, domestic financial institutions are generally required to prepare and submit a Currency Transaction Report ("CTR") (IRS Form 4789) to report large cash transactions, consisting of transactions involving over $10,000 in currency, every time they occur at a financial institution.

6. The contents of this Affidavit are based upon my personal knowledge, information provided to me through special agents of the Drug Enforcement Administration ("DEA"), other law enforcement personnel and witnesses, review of documents, written reports, and my training background and experience. Unless specifically stated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. This affidavit is intended merely to show that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

III. **FACTS ESTABLISHING PROBABLE CAUSE**

7.  [redacted]

AFFIDAVIT OF
SPECIAL AGENT MARK D. TWITCHELL     2
**FILED UNDER SEAL**

1  ████████████████████████████████████████████
2  ████████████████████████████████████████████
3  ████████████████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████
6  ████████████████████████
7  ████████████████████████████
8  ████████████████████████████████████████████
9  ████████████████████████████████████████████
10 ████████████████

11  9.      Between August 1, 2013 and August 6, 2013, the DEA UCA had multiple telephone
12  conversations with ███████ to arrange a meeting between DEA UCA, ███████, KESLINKE, and an
13  IRS Undercover Agent ("IRS UCA"). On August 8, 2013, the DEA UCA and the IRS UCA met with
14  ███████. The DEA UCA and ███████ began discussing drug trafficking in Los Angeles and how it
15  was difficult to transport drug proceeds from Los Angeles to New York City. Later in the conversation,
16  ███████ told the IRS UCA that his "accountant" could do it (in reference to getting the money to New
17  York). After ███████ asked the IRS UCA how much cash he was looking to launder each week, the
18  IRS UCA stated he would like to start with a few test runs between $30,000 and $50,000. ███████
19  responded, "he [KESLINKE] could do that."
20  10.     On August 20, 2013, the IRS UCA met with ███████ and KESLINKE in Antioch, California.
21  During the meeting, the IRS UCA represented the money he had to be from sale of illegal drugs in Los
22  Angeles, California. For example, the IRS UCA stated, "I don't touch the stuff, I don't touch pills, I
23  don't touch scripts, I don't touch nothing." The IRS UCA later stated, "these idiots are cutting the coke
24  on the same tables as the cash and it hits."
25  11.     Later during the meeting on August 20, KESLINKE stressed to the IRS UCA the importance of
26  creating a "structure that doesn't raise an eyebrow." KESLINKE stated, "I need to understand your
27  business and what you're capable of and then mine and see where those fit together and where there can
28  be this natural business relationship that passes the sniff test all day long." KESLINKE indicated he

AFFIDAVIT OF
SPECIAL AGENT MARK D. TWITCHELL          3
**FILED UNDER SEAL**

would structure the cash received from the IRS UCA into many different bank accounts and tell the banks that the influx of cash deposits were from a new business he bought. KESLINKE stated he had good bank relationships with Bank of America, Wells Fargo, Mechanics Bank and Fremont Bank. KESLINKE stated if he went into the bank with "7 [$7,000], 8 $8,000], and separate it out a little. No problem." Later, KESLINKE stated, "I like going in with 48 [$4,800], 62 [$6,200], and you know, stuff like that. A lot of guys go in with 99, 99 [$9,900], well they catch on to that." KESLINKE told the IRS UCA that "getting money out isn't too bad. Getting it in is the harder part." KESLINKE said he would need the IRS UCA's routing number, account number, and financial institution name to complete wire transfers.

12. On August 22, 2013, the IRS UCA and KESLINKE talked over telephone. The IRS UCA told KESLINKE he wanted to meet and indicated he was going to bring the money to the meeting for KESLINKE. KESLINKE said they would "talk about the financing" during the meeting and indicated that ▓▓▓ told him the fee [for laundering the money] was already set at 10%.

13. On August 26, 2013, KESLINKE, ▓▓▓, the DEA UCA and the IRS UCA met at a Starbucks located in Antioch, CA. At the end of the meeting, KESLINKE instructed the IRS UCA to give the cash to ▓▓▓ so ▓▓▓ could count the money. KESLINKE provided ▓▓▓ with a key to Suite 205 located inside 2006 A Street, Antioch, California. The IRS UCA and the DEA UCA followed ▓▓▓ into Suite 205 inside of 2006 A Street, Antioch, CA and provided ▓▓▓ with $55,000 cash ($50,000 to launder + $5,000 fee).

14. On August 27, 2013, the bank account which the IRS UCA provided KESLINKE received a $50,000 wire deposit from a company called Alamo Glenn Partners, LLC. The IRS UCA was able to determine that the wire originated from a Merrill Lynch Pierce Fenner & Smith Incorporated bank account. Based on information received from a subpoena request to Merrill Lynch, agents learned that KESLINKE opened the bank account in the name of Alamo Glenn Partners, LLC on July 1, 2013. KESLINKE was listed as the sole singer on the account.

15. On September 29, 2013, KESLINKE met with the IRS UCA at a restaurant, located in San Ramon, California. The IRS UCA provided KESLINKE $100,000 in a backpack and an additional $9,000 as a fee.

AFFIDAVIT OF
SPECIAL AGENT MARK D. TWITCHELL       4
FILED UNDER SEAL

16. During the meeting on September 29, the IRS UCA mentioned how he "would rather keep "Moss" [redacted] and "Vince" [DEA UCA] away from us [KESLINKE and the IRS UCA] as much as possible...that's why we never travel product [drugs] and money together. We never mix." Later in the conversation the IRS UCA told KESLINKE that "Vince" (DEA UCA) began getting "product in Mexico." Later in the conversation, after the IRS UCA attempted to decrease KESLINKE's fee, KESLINKE responded, " . . . at some point it becomes, you know, the risk starts to overtake, the, um reward, so to speak."

17. On September 30, 2013, the bank account which the IRS UCA provided to KESLINKE received a $100,000 wire deposit. The IRS UCA was able to determine that the wire originated from a Fremont Bank account. According to information received from a subpoena request to Fremont Bank, agents learned that KESLINKE opened the bank account in the name of Chattel Properties on May 2, 2012. KESLINKE was listed as the sole singer on the account.

20. On October 25, 2013, KESLINKE again met with the IRS UCA at a restaurant in San Ramon, California. The IRS UCA provided KESLINKE with $100,000 in a backpack and an additional $8,500 as a fee.

18. During the meeting on October 25, KESLINKE said he would wire the money into the IRS UCA's bank account in two separate transactions. KESLINKE told the IRS UCA he would send one of the wire transfers to the IRS UCA's bank account that day. While referencing the source of the funds, the IRS UCA stated, "If the Oxy [reference to oxycodone] starts moving a little bit more . . . they [DEA UCA] are talking about two [$200,000] every two weeks is as much as they can do." KESLINKE told the IRS UCA his desire to keep their communication over the telephone and text messages discreet. For example, KESLINKE stated, "I think the less, you know, that is said, even via text and stuff. Always the better." During the same meeting, after the IRS UCA explained the DEA UCA was always looking for new places to distribute oxycodone, KESLINKE asked, "how much per?" KESLINKE then explained how he would "be interested to know" because he has an associate who might be interested in oxycodone. The IRS UCA told KESLINKE that they (DEA UCA and IRS UCA) were not looking for "street stuff" (small quantities), rather they were looking for someone to move higher levels. In

AFFIDAVIT OF
SPECIAL AGENT MARK D. TWITCHELL          5
FILED UNDER SEAL

1 reference to his associate, KESLINKE responded, "no, I know. He would probably be able to do big
2 numbers."
3 19. On October 25, 2013, a surveillance unit followed KESLINKE after he took the backpack from
4 the IRS UCA which contained the $100,000 cash. At approximately 11:17 a.m., KESLINE was
5 observed entering a Fremont Bank branch location. KESLINKE walked up to the teller and appeared to
6 make a transaction. At approximately 11:28 am, KESLINKE exited the Fremont Bank branch.
7 20. On October 25, 2013, the IRS UCA's bank account received a $46,000 wire transfer from
8 Fremont Bank. Based on information received from a subpoena request to Fremont Bank, agents
9 learned that KESLINKE initiated the wire transfer at 11:18 am on October 25, 2013, from a bank
10 account in the name of Aloha Management Corp. KESLINKE opened the bank account on October 30,
11 2009 and was listed as the sole singer on the account.
12 21. On November 1, 2013, the IRS UCA's bank account received a wire transfer from a Fremont
13 bank account in the amount of $54,000, thereby completing the laundering of the full $100,000 cash
14 provided to KESLINKE on October 25, 2013. The Chattel Properties bank account was again used by
15 KESLINKE to send the wire transfer.

## IV. CONCLUSION

22. Based upon the information contained within this affidavit, I submit that I have established probable cause to believe that Anthony KESLINKE has violated Title 18, United States Code, Section 1956(a)(3), laundering of monetary instruments.

_____     02-06-2014
Mark D. Twitchell             Date
IRS Special Agent

SUBSCRIBED TO AND SWORN TO BEFORE
ME ON THIS 6th DAY OF FEBRUARY, 2014.

_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge

AFFIDAVIT OF
SPECIAL AGENT MARK D. TWITCHELL        6
FILED UNDER SEAL